2025 IL App (1st) 241535
No. 1-24-1535
Opinion filed December 31, 2025

FIFTH DIVISION

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Cook County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No.10 CR 14466 |
| TARENZO DILLON, | ) ) | The Honorable |
| Defendant-Appellant. | ) ) ) | Sophia Atcherson, Judge, presiding. |

JUSTICE ODEN JOHNSON delivered the judgment of the court, with opinion.
Presiding Justice Mitchell and Justice Mikva concurred in the judgment and opinion.

**OPINION**

¶ 1 Defendant Tarenzo[1] Dillon was convicted after a jury trial of aggravated battery with a firearm and sentenced to 20 years with the Illinois Department of Corrections (IDOC). This

---

[1] The Rule 23 order addressing defendant's direct appeal spelled his first name as "Torenzo." *People v. Dillon*, 2014 IL App (1st) 123095-U. However, the Rule 23 order addressing the trial court's dismissal of his first section 2-1401 petition spelled his name "Tarenzo," noting that this appears to be the spelling of his first name in his *pro se* petition. *People v. Dillon*, 2023 IL App (1st) 220472-U, ¶ 2 n.1. For the same reason, we also use the "Tarenzo" spelling.

court affirmed his conviction and sentence on direct appeal, finding unpersuasive his one claim on appeal, which was that his sentence was excessive. *People v. Dillon*, 2014 IL App (1st) 123095-U.

¶ 2 On February 7, 2020, defendant filed his first *pro se* petition pursuant to section 2-1401 of the Code of Civil Procedure (735 ILCS 5/2-1401 (West 2020)). Defendant's first section 2-1401 petition argued that he had to be resentenced because the sentencing court had relied on a now void conviction. Defendant argued that his 2005 conviction, by guilty plea, for aggravated unlawful use of a weapon (AUUW) had been rendered void by *People v. Aguilar*, 2013 IL 112116. On September 23, 2020, defendant moved, separate and apart from his then-pending section 2-1401 petition, to vacate his AUUW conviction. On October 1, 2020, his AUUW conviction was formally vacated, and on December 10, 2020, he received a certificate of innocence for the AUUW offense.

¶ 3 Nonetheless, on March 4, 2022, the trial court dismissed defendant's 2-1401 petition,[2] finding that the sentencing court in his aggravated battery case had given the now-vacated AUUW conviction " 'little weight.' " *People v. Dillon*, 2023 IL App (1st) 220472-U, ¶ 18 (quoting the trial court). Defendant appealed, and we affirmed the dismissal on the ground that his section 2-1401 petition offered no explanation for his lack of due diligence. We observed that, although *Aguilar* was decided back in 2013, his 2020 petition "offers no explanation as to why defendant took no action on that issue for more than seven years." *Dillon*, 2023 IL App (1st) 220472-U, ¶ 42.

---

[2]In December 2021, after his AUUW conviction was vacated, defendant refiled his section 2-1401 petition since the trial court had not yet ruled on it. *Dillon*, 2023 IL App (1st) 220472-U, ¶ 17.

¶ 4 Attempting to cure the problem with his first section 2-1401 petition, defendant filed a second petition on January 29, 2024. His second section 2-1401 petition offers an explanation of what delayed him for so many years in bringing his claim—namely, issues with various jailhouse lawyers. For the following reasons, we affirm the trial court's June 27, 2024, dismissal of his second 2-1401 petition.

¶ 5 I. BACKGROUND

¶ 6 A. Evidence at Trial

¶ 7 Since we are faced with a purely legal question on this appeal, we only summarize the relevant facts and incorporate by reference our prior order that delineates the facts and evidence deduced at trial. *Dillon*, 2014 IL App (1st) 123095-U. In sum, the evidence at trial established that defendant got into an argument with a man at a party on July 18, 2010. After the argument, defendant went to his car, got a gun, and shot toward the now fleeing man, who was running in the direction of a woman and her 18-month old daughter. The woman and her daughter were in a public park, where many people were present. As a result of the shooting, the 18-month old was left with permanent scarring to her face, neck, shoulder, and back. *Dillon*, 2014 IL App (1st) 123095-U, ¶¶ 3-5. The jury found defendant guilty of aggravated battery with a firearm. *Dillon*, 2014 IL App (1st) 123095-U, ¶ 2. After listening to evidence in mitigation and in aggravation, the trial court sentenced defendant to 20 years, which was in the mid-range of the possible 6 to 30-year sentence. *Dillon*, 2014 IL App (1st) 123095-U, ¶ 15. At sentencing, the trial court noted many factors, including that defendant fired a gun in a public park with others present. *Dillon*, 2014 IL App (1st) 123095-U, ¶ 16.

¶ 8                          B. Section 2-1401 Petitions

¶ 9                             1. The First Round

¶ 10       We describe below the procedural history and the facts needed to decide the issues presented on this appeal.

¶ 11       In our prior Rule 23 order, which dismissed defendant's first section 2-1401 petition, we observed that defendant did not contend on appeal that he acted with due diligence in filing his petition. "Rather, he request[ed] that, '[i]f this Court finds that [his] efforts as reflected in the record are insufficient to show due diligence, it should grant [him] the opportunity to show that he had a "reasonable excuse" for not filing his 2-1401 petition before he did.' " *Dillon*, 2023 IL App (1st) 220472-U, ¶ 41. We found that defendant's appellate briefs did "not identify any factual issues regarding his due diligence that require further development in an evidentiary hearing." *Dillon*, 2023 IL App (1st) 220472-U, ¶ 42. As a result, we saw "no need to remand this case for an evidentiary hearing on the issue of due diligence." *Dillon*, 2023 IL App (1st) 220472-U, ¶ 42. "Accordingly, we affirm[ed] the trial court's dismissal of defendant's section 2-1401 petition." *Dillon*, 2023 IL App (1st) 220472-U, ¶ 41.

¶ 12                            2. The Second Round

¶ 13       The above-described Rule 23 order was filed on April 26, 2023. Nine months later, on January 29, 2024, defendant filed his second section 2-1401 petition, in which he inserted a section titled "Due Diligence." In this section, defendant makes the following allegations.

¶ 14       Defendant alleges that, on September 26, 2012, following his conviction in the instant case, he filed a direct appeal. At first he was incarcerated in Stateville, but then he was transferred to the Lawrence Correctional Center in October 2012. On November 26, 2014, the appellate court affirmed his conviction and sentence on direct appeal. While his direct appeal

was pending, the Illinois Supreme Court decided *Aguilar*. However, defendant asserts that he was not aware of it.

¶ 15        Defendant alleges that on December 17, 2014, with the help of the library clerk in the Lawrence Correctional Center, defendant submitted his postconviction petition. Since the clerk made no mention of *Aguilar*, defendant was still unaware of it when he filed the petition. However, at some point, while at Lawrence, he was talking to a jailhouse lawyer who told him about *Aguilar* and that defendant could have his conviction and sentence removed from his record. This jailhouse lawyer offered to file a section 2-1401 petition for defendant. However, on September 30, 2015, before this jailhouse lawyer could finish preparing defendant's section 2-1401 petition, defendant was transferred to Danville Correctional Center.

¶ 16        Defendant alleges that, while at Danville, defendant learned of a jailhouse lawyer at Danville. However, this second jailhouse lawyer did not live in the same housing unit as defendant, so defendant had no way of talking with him. In April 2016, defendant's cellmate identified the jailhouse lawyer while they were in "the chow hall." This second jailhouse lawyer said that he would review defendant's paperwork to see if defendant did, indeed, have an *Aguilar* claim. However, since they were in two different housing units, there was no way for defendant to give the jailhouse lawyer his paperwork. In addition, defendant did not see this second jailhouse lawyer again within the facility. Defendant alleges: "With not knowing what to do next or who to seek help from, [defendant] just went on with his prison life."

¶ 17        Defendant alleges that, in 2018, this second jailhouse lawyer started working within the facility's law library, and defendant heard about it. As a result, defendant started submitting request slips to go to the law library. At the library, defendant spoke with the jailhouse lawyer about starting the process on defendant's *Aguilar* claim. However, the jailhouse lawyer said

defendant would have to wait because he was helping another inmate. Eventually, the jailhouse lawyer told defendant that not only could defendant remove the AUUW conviction and sentence from his record, but that defendant could also ask the court to resentence him on the aggravated battery charge, if the State had asked the sentencing court to consider the unconstitutional AUUW conviction at his sentencing hearing.

¶ 18    Defendant alleges that the jailhouse lawyer then lost his law library job, and the two men lost contact again. Defendant states that "for about eight months or so [defendant] was again stuck in limbo." In 2019, the jailhouse lawyer started working again in the law library, and defendant started to go there again. The jailhouse lawyer agreed to start working on defendant's petition again, but after "two or so months," the jailhouse lawyer was "fired again and was in the restricted housing unit (seg)." Defendant lost contact with him again. Subsequently, an Internal Affairs Officer called defendant to his office for defendant to retrieve the paperwork that had been in the jailhouse lawyer's possession. Defendant alleges that, as a result, he "was left to [*sic*] on his own file something in court to try and have his AUUW offense removed from his record."

¶ 19    Defendant alleges that, first, he filed a section 2-1401 petition arguing that, during the sentencing hearing for the instant offense, the trial court heard evidence in aggravation that included his now void AUUW conviction. Then, on September 23, 2020, defendant filed a motion, separate from his section 2-1401 petition, seeking to vacate the AUUW conviction.

¶ 20    Defendant alleges that, seven months after the appellate court dismissed his first section 2-1401 petition, he "immediately filed another 2-1401 petition once he learned from the appellate court that he needed to show due diligence."

¶ 21    The trial court dismissed defendant's second section 2-1401 petition on June 27, 2024, finding

"defendant claims that he should receive a new sentencing hearing because the State used his void aggravated unlawful use of a weapon (AUUW) conviction at sentencing. This claim has already been decided on the merits in the 2022 order. *Res judicata* and the law of the case doctrine bars reconsideration or relitigation of an issue previously decided in the case. *People v. Tenner*, 206 Ill. 2d 381, [395] (2002). The Appellate Court affirmed denial or relief on this issue previously, and [defendant] cannot now seek relief for the same claim."

¶ 22    Defendant filed a timely notice of appeal on July 18, 2024, and this appeal followed.

¶ 23                                    II. ANALYSIS

¶ 24    On appeal, defendant raises only one claim, which is that the trial court erred in dismissing his second section 2-1401 petition, where (1) his prior AUUW conviction was void, (2) the sentencing court allegedly relied on it when sentencing him for the instant offense, and (3) he has now allegedly explained his apparent lack of due diligence. For the following reasons, we do not find defendant's arguments persuasive and affirm the trial court's dismissal of his second section 2-1401 petition.

¶ 25    We review the dismissal of a section 2-1401 petition *de novo*. *People v. Carter*, 2015 IL 117709, ¶ 13; *People v. Laugharn*, 233 Ill. 2d 318, 322 (2009) (citing *People v. Vincent*, 226 Ill. 2d 1, 18 (2007)). *De novo* consideration means that we perform the same analysis that a trial judge would perform. *Arient v. Shaik*, 2015 IL App (1st) 133969, ¶ 18.

¶ 26    Section 2-1401 authorizes "a trial court to vacate or modify a final order or judgment in civil and criminal proceedings." *People v. Thompson*, 2015 IL 118151, ¶ 28. "Ordinarily, a

petition seeking relief under section 2-1401 must be filed more than 30 days from entry of the final order but not more than 2 years after that entry." *Thompson*, 2015 IL 118151, ¶ 28 (citing 735 ILCS 5/2-1401(a), (c) (West 2010)); *Laugharn*, 233 Ill. 2d at 322.

¶ 27 However, there are several exceptions to the time limitation. First, our supreme court has recognized "an exception to the ordinary two-year deadline when the petition challenges a void judgment." *Thompson*, 2015 IL 118151, ¶ 29. In the instant case, defendant is not challenging a void judgment. He already challenged his AUUW conviction in another proceeding and obtained a certificate of innocence. In the instant case, he does not argue that his aggravated battery conviction is void but rather that his sentence for it was affected by the now void AUUW conviction.

¶ 28 Second, there is "an exception to the time limitation for legal disability and duress or if the ground for relief is fraudulently concealed." *Vincent*, 226 Ill. 2d at 7 (citing 735 ILCS 5/2-1401(c) (West 2002)). Last but not least, "[r]elief should be granted under section 2-1401 when necessary to achieve justice." *People v. Lawton*, 212 Ill. 2d 285, 298 (2004). "To accomplish that goal, the statute is to be construed liberally." *Lawton*, 212 Ill. 2d at 298. " 'One of the guiding principles in the administration of section 2-1401 relief is that the petition invokes the equitable powers of the circuit court to prevent enforcement of a judgment when doing so would be unfair, unjust, or unconscionable.' " *People v. Steward*, 406 Ill. App. 3d 82, 92 (2010) (quoting *Lawton*, 212 Ill. 2d at 297).

¶ 29 "To obtain relief under section 2-1401, the defendant 'must affirmatively set forth specific factual allegations supporting each of the following elements: (1) the existence of a meritorious defense or claim; (2) due diligence in presenting this defense or claim to the circuit court in the original action; and (3) due diligence in filing the section 2-1401 petition for

relief.' " *People v. Pinkonsly*, 207 Ill. 2d 555, 565 (2003) (quoting *Smith v. Airoom, Inc.*, 114 Ill. 2d 209, 220-21 (1986)). "[A]n action brought under section 2-1401 is a civil proceeding and, according to this court's long-standing precedent, is subject to the usual rules of civil practice, even when it is used to challenge a criminal conviction or sentence." *Vincent*, 226 Ill. 2d at 6.

¶ 30     When reviewing a trial court's dismissal of a section 2-1401 petition, this court may affirm "on any basis we find in the record." *People v. Nitz*, 2012 IL App (2d) 091165, ¶ 13. In the case at bar, we agree that the preclusion doctrine of law of the case applies. " 'The law of the case doctrine limits relitigation of a previously decided issue in the same case [citation] and encompasses not only the court's explicit decisions, but those issues decided by necessary implication [citation].' " *Underwood v. City of Chicago*, 2025 IL App (1st) 231132, ¶ 49 (quoting *Rommel v. Illinois State Toll Highway Authority*, 2013 IL App (2d) 120273, ¶ 15). " 'The doctrine applies to questions of law on remand to the trial court, as well as on subsequent appeals to the appellate court.' " *Underwood*, 2025 IL App (1st) 231132, ¶ 49 (quoting *Rommel*, 2013 IL App (2d) 120273, ¶ 15, citing *Radwill v. Manor Care of Westmont, IL, LLC*, 2013 IL App (2d) 120957, ¶ 8).

¶ 31     The case at bar raises the exact same question that defendant raised in his last appeal and that was decided in the last appeal—namely, whether this court should order an evidentiary hearing to determine defendant's due diligence. In defendant's prior appeal, his appellate briefs acknowledged that due diligence was an issue and a problem for him. *Dillon*, 2023 IL App (1st) 220472-U, ¶ 41. However, we found that his briefs failed to identify any factual questions regarding this issue that would require an evidentiary hearing. *Dillon*, 2023 IL App (1st)

220472-U, ¶ 42. Thus, this exact same issue—namely, his due diligence—was raised by him in the last appeal and decided and, thus, became the law of the case.

¶ 32     We are well aware that the " 'guiding' " principle with a section 2-1401 petition is to achieve justice. *Steward*, 406 Ill. App. 3d at 92 (quoting *Lawton*, 212 Ill. 2d at 297). In his current section 2-1401 petition, defendant concedes that he first became aware of *Aguilar* in 2015, when speaking to a jailhouse lawyer, but that he did not file a petition based on *Aguilar* until five years later. Defendant alleges that he spoke to a second jailhouse lawyer in April 2016, but when defendant did not see him again, defendant "just went on with his prison life," letting two years go by, until defendant made contact again with this second jailhouse lawyer in 2018. Then, another two years slipped by, and, in the end, defendant simply filed something "on his own." Even if we accept defendant's representations as true without an evidentiary hearing, we do not see due diligence in these allegations.

¶ 33     Further, we have read every page of the almost one hundred-page sentencing transcript, and we agree with the trial court which found that the sentencing court in his aggravated battery case had given the now-vacated AUUW conviction " 'little weight.' " *Dillon*, 2023 IL App (1st) 220472-U, ¶ 18 (quoting the trial court).

¶ 34     The sentencing transcript established the following facts about defendant's prior criminal history, which included (1) the 2005 AUUW and (2) a federal theft misdemeanor. First, in 2005, when defendant was in his early twenties, he pled guilty to AUUW. The arresting officer in the AUUW case testified at the sentencing hearing in the aggravated battery case. The officer testified that, on October 28, 2005, he stopped defendant's vehicle for a traffic violation—namely, it had no front plate. After defendant failed to produce a driver's license, the officer placed him under arrest and searched the car in preparation for towing. During the

inventory search, the officer recovered a loaded semi-automatic handgun from under the driver's seat. The gun had four live rounds, including one in the chamber. After the officer transported defendant back to the station and read him his *Miranda* rights (see *Miranda v. Arizona*, 384 U.S. 436 (1966), defendant said that he forgot the gun was there. The officer also determined that defendant lacked a Firearm Owner's Identification (FOID) card.

¶ 35        Second, on June 3, 2010, defendant was released on a $4,500 bond, related to the theft of federal property—namely, his receipt of unemployment benefits when he was actually working. A little over a month later, while defendant was out on bond, the shooting in this case occurred. Defendant subsequently pled guilty to a misdemeanor federal offense, for which he received 36 months of federal probation and was ordered to pay over $19,000 in restitution. The guilty plea itself was for the cashing of an unemployment check that totaled only $744. However, the over $19,000 in restitution was related to defendant's receipt of prior unemployment benefits.

¶ 36        Regarding the federal offense, defendant's cousin and stepfather, who both testified at the sentencing hearing, explained: that defendant had worked for 6½ years as a machine operator at Meade West Packaging; that defendant would be periodically laid off by Meade and then called back to work there; and that defendant collected unemployment benefits during the periods when he was laid off. However, they were both aware that, at some point, when he was called back to work at Meade, defendant continued to receive unemployment checks without informing anyone that he had returned to work.

¶ 37        In mitigation, the defense presented numerous letters from family and friends. Defendant's cousin and stepfather testified, describing a large, close-knit family, of which defendant was an important part. They testified that defendant had three children who he had

raised and supported. In aggravation, in addition to the officer who testified about the prior gun offense, the State called the victim's mother. The mother testified regarding the trauma that both she and her daughter had suffered as a result of the shooting. The mother testified that, prior to the shooting, her daughter was a "fearless little girl," but, after the shooting, everything changed. Her daughter received multiple wounds to her face, neck, shoulder, and back, which left scars in all these places. In addition to the physical scars, her daughter was afraid whenever a doorbell rang, and had nightmares. The mother's other children also needed counseling. as did the mother, who was often afraid to leave the house.

¶ 38    After listening to the evidence in mitigation and aggravation, the trial court delivered six pages of sentencing remarks. Discussing defendant's prior criminal history, the court stated:

> "I must take into consideration the importance of protecting the public because he was given the opportunity to change his life after crime number one[,] possessing a gun in the streets of Chicago, maybe he did forget about it but then he steals money from the government, [with a] legitimate employer who are out there trying to give you an opportunity and while on bond in that crime, he still commits another crime by taking a gun back into the city and firing it into a public park. This is not a man who has regard for others."

Discussing the AUUW above, the trial court seemed to cut defendant some slack and give some credit to defendant's remark that he had forgotten that the gun was even there.

¶ 39    However, the factor that the trial court came back to several times in its sentencing remarks was that defendant had fired into a public park. For example, the trial court stated:

12

"He fired that gun into a public city park with many people out there by his own witnesses['s] testimony[,] having parties, his own family out there engaged in celebrating a birthday as was [the victim's] family and as were all the other citizens of the city of Chicago [who] have the right to enjoy the public peace of a park. He violated that public peace."

¶ 40 The trial court also discussed repeatedly the trauma suffered by the victim and her mother. The court's last remark before issuing the 20-year sentence was about the victim: "She survived physically. Her emotional trauma will go on for the rest of her life I suspect, and this Court takes that into consideration." The trial court then pronounced the 20-year sentence.

¶ 41 At the sentencing hearing, the defense asked for a sentence of 6 to 8 years, while the State asked for 30 years. After listening to the exhaustive evidence in both aggravation and mitigation, 'King Solomon' would not have been able to come up with a sentence that satisfied everyone involved. However, it is clear to us that the prior AUUW conviction had minimal impact on defendant's sentence. Thus, with justice as our guiding principle, we affirm the trial court's dismissal of defendant's second section 2-1401 petition.

¶ 42                                   III. CONCLUSION

¶ 43 For all the foregoing reasons, we do not find defendant's claims persuasive. First, we find that the law of the case doctrine applies to preclude defendant's claim. Second, even if it did not apply, defendant's allegations do not merit an evidentiary hearing regarding due diligence. Lastly, even if the preclusion doctrine did not apply and even if defendant's allegations established due diligence, we must agree with the trial court, which found that the now-void AUUW conviction had little impact at sentencing. Thus, we affirm the trial court's dismissal of his second section 2-1401 petition.

¶ 44  Affirmed.

***People v. Dillon*, 2025 IL App (1st) 241535**

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 10-CR-14466; the Hon. Sophia Atcherson, Judge, presiding. |
| **Attorneys for Appellant:** | James E. Chadd, Douglas R. Hoff, and Arianne Stein, of State Appellate Defender's Office, of Chicago, for appellant. |
| **Attorneys for Appellee:** | Eileen O'Neill Burke, State's Attorney, of Chicago (John E. Nowak, Matthew Connors, and Noah Montague, Assistant State's Attorneys, of counsel), for the People. |